965 A.2d 1181

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DIEGO
VALLEJO, A/K/A DIEGO VALLJOTARAGURY, DIEGO TARAGU-
RY AND DIEGO T. VALLEJO, DEFENDANT–APPELLANT.

Argued January 6, 2009—Decided March 10, 2009.

*Joseph J. Benedict* argued the cause for appellant (*Benedict and Altman,* attorneys; *Mr. Benedict* and *Philip Nettl,* on the brief).

*Nancy A. Hulett,* Assistant Prosecutor, argued the cause for respondent (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

Justice LONG delivered the opinion of the Court.

Defendant was convicted of a passel of offenses arising out of the alleged kidnapping and restraint of the victim, with whom he had been in a romantic relationship. During a short trial, prior incidents of domestic violence and the existence of a restraining order against defendant were referenced by various witnesses, without objection. An immediate curative instruction was not given, although an ambiguous instruction did issue at the end of the trial. The Appellate Division determined that the *N.J.R.E.* 404(b) evidence was inadmissible and that the curative instruction was no model, but concluded that even if the instructive was inadequate, the error was not capable of producing an unjust result in light of the overwhelming evidence in the case.

We disagree. This brief trial was poisoned by the recurring admission of evidence of other crimes and wrongdoings by defendant, and by reference to the domestic violence restraining order against him. The trial judge's curative instruction was too little,

too late. As a result, defendant was denied the fair trial to which all defendants, regardless of the strength of the case against them, are entitled. Therefore, a new trial is required.

## I.

Defendant Diego Vallejo was indicted for (1) first-degree kidnapping, *N.J.S.A.* 2C:13–1(b)(2); (2) second-degree robbery, *N.J.S.A.* 2C:15–1; (3) second-degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(1); and (4) third-degree terroristic threats, *N.J.S.A.* 2C:12–3(a). At trial, the following evidence was adduced.

In 2005, defendant and Miryam Vera,[1] first cousins, were in a dating relationship and living together in defendant's parents' home. Her family disapproved of their relationship, which apparently had been rocky. On May 21, 2005, Vera left work around 11:30 p.m. and attempted to pick defendant up at his place of employment. When she arrived, she was unhappy to find him absent, and so she drove around for a while contemplating ending their relationship. Defendant called about an hour later, and Vera drove home. Upon her arrival, she went straight into their bedroom, where she found defendant, and immediately the two began to argue. After a while, Vera left the bedroom to use the bathroom and then returned.

According to Vera, she subsequently attempted to leave the bedroom again, but defendant locked the door and held on to her in order to keep her from exiting. At some point during the incident, Vera said that she was lying down on the bed when defendant hit her once in the back of the head and between the legs. Vera also testified that defendant threatened to cut her face if she left. According to her testimony, when Vera had to use the bathroom, she was forced to urinate in a bucket because defendant

---

[1] The spelling of Vera's first name also appears in the record and proceedings below as Miriam, and her last name is spelled as Viera in some portions of the record.

would not let her leave the room. Vera became tired and went to sleep on the bed, while defendant slept on the floor.

According to Vera, throughout the incident, defendant repeatedly asserted that he did not want her to leave and that he would hurt her if she left. She awoke the next day at about 1:30 p.m. and tried to leave, but defendant stood by the door and repeatedly unpacked her bag as she attempted to pack it. Vera stated that defendant was "pushing [her] around," yanking her arm, and screaming, and that she was crying. The noise was heard by defendant's father, who asked them to open the door. Once defendant opened it, Vera ran across the hallway into defendant's parents' bedroom; she then telephoned her mother, Rosario Juarez, for help. Defendant's father told defendant to let Vera pack and leave, but once she came back into the room and attempted to do so, defendant again closed the door and refused to let her leave. At that point, Vera's mother arrived.

Vera testified that Juarez knocked on the locked door and asked defendant to let Vera out, threatening to call the police if defendant did not comply. Approximately ten minutes later, the police arrived, and at an officer's request defendant opened the door. Defendant yanked Vera's purse from her hand and ran out of the bedroom with it. Vera then went downstairs where she found her mother and Officer Paul Braconi. Vera told Officer Braconi what had happened, and defendant denied taking Vera's purse. The purse was later found and returned to Vera.

Juarez testified that at some time after 2:00 p.m., she received a phone call from Vera, asking her to come and help her because defendant was hitting her. At approximately 2:30 p.m., Juarez arrived at the home. She testified that she heard her daughter screaming, immediately went upstairs to the bedroom, and repeatedly asked defendant to open the door. Juarez testified that she could hear her daughter inside the room screaming and crying and asking defendant to let her go. Soon after, defendant's parents arrived. Defendant's father knocked on the door and told defendant to open the door. Defendant did not comply. Juarez

threatened to call the police, and when defendant refused to open the door, she went outside and called 911.

After the police arrived, Juarez entered the house with them and saw Vera. According to Juarez, Vera's face looked as though she had been crying all night. Juarez did not notice any injuries on Vera's body, but later observed bruises on her arms.

Officer Braconi testified that when he first arrived at the house, he encountered Vera inside the house but outside of the bedroom. Vera was upset and said that she wanted to leave, but her boyfriend would not allow her to do so and that he had taken important belongings of hers without which she could not go. In Braconi's presence, defendant grabbed Vera's arm and told her that she could not leave.

Braconi described the bedroom as being in a state of disarray. He observed items that had been knocked over, a laptop computer on the floor, a "mattress-type thing" that had been tossed to the side, and a bucket. Braconi also observed abrasions on Vera's arms, which he believed were consistent with her claims regarding defendant pulling her purse strap. Vera later provided police with a formal statement, and pictures were taken of her bruises.

Prior to the trial, a *N.J.R.E.* 104 hearing had been held regarding a prior domestic violence incident between Vera and defendant. The trial judge denied the State the ability to refer to that incident. Despite that ruling, Vera, Juarez, and Braconi provided testimony that alluded to that prior incident and others.

The first remark came near the beginning of Vera's direct examination:

Q   Now, Miriam, drawing your attention to the early part of May 21st of 2005, can you explain to us what happened that day?

A   *Okay, I got confused when you said May. I thought it was the incident in East Brunswick.* All right, this one is the one that happened in New Brunswick. [ (Emphasis added).]

Later, in Vera's direct testimony, she made a second reference to a prior incident:

Q   And what did you say to your mother when you called her?

A   Just to please pick me up[,] that[ ] I needed help.

Q   And did you tell her why you needed help?

A   She already could tell something was wrong.

Q   I'm sorry, continue.

A   Because I was crying on the phone, I just told her please come and get me and she already knew so she hung up, I hung up and she came.

Q   And when you say she already knew, she already knew what?

A   *Something was wrong because we've had incidents before.*

[(Emphasis added).]

Defense counsel did not object to either statement and the trial judge did not intervene.

In addition, the prosecutor elicited testimony from Vera about the final restraining order that she had obtained against defendant as a result of the incident at issue in this case:

Q   Now, Ms. Vera, what did you do at the police station?

A   I did a written statement and took pictures and I'm pretty sure a tape.

Q   I am just going to ask you to keep your voice up. Did you have a chance to speak to anyone at the police station?

A   Yeah, domestic violence crew, and that's about it.

Q   *And as a result of this did you get a restraining order against the defendant?*

A   *Yes, and it was finalized.*

Q   *So that restraining order is still in effect as of today?*

A   *Yes.*

[(Emphasis added).]

Again, defense counsel did not object and the trial judge did not give any immediate curative instructions.

During Juarez's testimony, the 911 tape was played for the jury, and transcripts were distributed to the jury. The 911 call included the following exchange:

DISPATCHER: [H]as anything like this happened before, or no?

CALLER: Oh,[ ] many times, and she's the one always taking that shit about him. I don't know why. She's thirty[-]two years old and he's only twenty[-]five.

During a pre-trial motion hearing, the judge admitted the conversation for a limited purpose; however, the jury was not informed of the limited purpose for which the 911 call was offered.

Braconi was asked on cross-examination about Juarez's demeanor during the incident:

Q  And her mother, was she calm?

A  Miss Vera's mother?

Q  Yes?

A  No.

Q  What was her demeanor?

A  She was, she was talking loudly, saying she wanted to get her daughter out of the house.

Q  Was she encouraging you to arrest her nephew?

A  *She was claiming that he had beaten her up in the past and things of that nature.*

[(Emphasis added).]

Like the others, that comment was not addressed by defense counsel or the court.

During the charge conference, the trial judge acknowledged the need for a curative instruction regarding the cumulative testimony of defendant's prior bad acts. Near the beginning of the jury charge, the judge instructed the jury that "I am also going to give you some limiting instructions as to how to use certain evidence, and when I do you are to use the evidence for that purpose only, for that limited purpose only. You can't use it for any other purpose." The only part of the charge that actually referenced, in any manner, the inadmissible testimony was the trial judge's instruction that:

> During the course of the trial, also, things were blurted out that have nothing to do with this case. You can't use any of that blurted out information because that's not part of this case. Do you understand what I am saying? It's what you heard from the witness stand. Both parties have a right for you to consider only that which was dealt with in this courtroom relating to an incident that happened on May 21st, 2005[,] in North Brunswick. Nothing before this, nothing after this. We are on the same page.

The jury convicted defendant of first-degree kidnapping, second-degree robbery, and third-degree terroristic threats. In addition, sitting as the trier of fact, the judge found defendant guilty of the disorderly persons offense of simple assault, in violation of *N.J.S.A.* 2C:12–1(a). Defendant was sentenced to an aggregate custodial term of fifteen years, subject to the No Early Release Act. *N.J.S.A.* 2C:43–7.2.

Defendant moved for a new trial, arguing, among other things, that the guilty verdict on the kidnapping charge was against the weight of the evidence. He based the motion on new evidence provided by Vera to the effect that she had not been truthful at trial. The gravamen of defendant's argument was that if Vera's testimony was in question, the remainder of the evidence against him would not have sustained a conviction.

The trial judge conducted a hearing on the motion. Vera recanted her trial testimony and stated, under oath, that she had previously lied because she was angry with defendant. She claimed that: (1) defendant did not hit her or kidnap her during the incident at issue; (2) she was still in a relationship with him during the trial, and as of the present motion hearing, she spoke to him almost every day and had visited him in jail; and (3) the bruising that she sustained from the incident was exaggerated because she was anemic and her skin bruised easily.

Defendant argued that Vera's trial testimony was not credible and that a new trial was warranted. In support of the notion that Vera's motion testimony should be credited, defense counsel argued that she had wavered even before the trial:

Judge, it is just such a serious matter. That the result is just such a manifest injustice. It really is. . . . And, Judge, if this ever becomes a PCR, I think I will be ineffective.

I didn't expect Miss Vera to show up. Judge, I just threw the first 14 people in the box. I may have used one or two challenges. But I made a big mistake. I know we're not in that type of proceeding. Just for the record, Judge, I was convinced she was not going to appear. But for the very strong efforts of the Office of the Prosecutor, I'm not condemning them in any way, this matter would have been dismissed after the jury was sworn, in my opinion. Because I was shocked when she was produced.

Defendant's argument in favor of a new trial was not based on the truth or falsity of Vera's recantation testimony, but only on the fact that its very existence shook any confidence in her credibility under oath. The judge denied the motion because he found that Vera's recantation was not credible.

Defendant appealed, arguing, among other things, that the trial judge committed plain error by failing to adequately instruct the

jury to disregard evidence of the prior incidents. The Appellate Division conceded that "the curative instruction was not given immediately after each offensive remark was made," and that "[it] did not specifically discuss the exact testimony the jury was directed to disregard." However, the court noted that the "instruction specifically direct[ed] the jury to only consider evidence about the day in question." Moreover, even if the curative instruction was considered inadequate, the court held that the error was not clearly capable of producing an unjust result because of the other evidence in the record of defendant's guilt.

Defendant also claimed that he was denied effective assistance of counsel. Included within that argument was the point that his counsel did nothing when Vera testified about the final restraining order. Defendant argued that that mistake had a prejudicial effect and that defense counsel should have objected to it. In the alternative, defendant argued that it was trial error for the judge not to have intervened *sua sponte.*

The Appellate Division preserved defendant's three ineffective-assistance-of-counsel arguments for post-conviction relief. However, the panel declined to address whether there was trial error in admitting the restraining-order evidence because the claim had only been presented in connection with defendant's challenge to his lawyer's effectiveness. Despite that, the panel included a footnote that said "[w]e would be remiss if we failed to comment on the prosecutor's questioning of Vera concerning having obtained a domestic violence restraining order. In light of [*State v. Chenique-Puey,* 145 *N.J.* 334, 678 *A.*2d 694 (1996) ], that line of testimony was improper and unwarranted." We granted defendant's petition for certification, 195 *N.J.* 519, 950 *A.*2d 905 (2008), and now reverse.

## II.

Defendant argues that the *N.J.R.E.* 404(b) evidence and the reference to the restraining order were plain error; that the curative instruction was insufficient to cure the error; and that he,

in fact, raised the issue of the restraining order testimony on its merits in his appellate brief.

The State concedes that the admission of the 404(b) testimony was wrong, but argues that it was fleeting, was cured by the instruction, and did not constitute plain error. The State also concedes that the restraining order testimony should not have been elicited, but argues that the instruction was adequate.

## III.

■ We turn first to the challenged evidence, recognizing the truism that every single thing that happens at a trial cannot be completely controlled:

> The plain fact of the matter is that inadmissible evidence frequently, often unavoidably, comes to the attention of the jury, and the record cannot be purged of all extraneous influence. Hence, it is axiomatic that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error ...; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently."
>
> [*State v. Winter*, 96 *N.J.* 640, 646, 477 *A.*2d 323 (1984) (alteration and omission in original) (quoting *Bruton v. United States*, 391 *U.S.* 123, 135, 88 *S.Ct.* 1620, 1627, 20 *L.Ed.*2d 476, 484 (1968)).]

■ Here, the questioned evidence includes: Vera's testimony alluding to a different domestic violence incident in East Brunswick and to the fact that she and defendant "had incidents before"; Juarez's testimony about the 911 call in which she stated that this had happened "many times" before; and Officer Braconi's testimony that "[Juarez] was claiming that [defendant] had beaten [Vera] up in the past and things of that nature."

That evidence serially described prior incidents of domestic violence, different from the incident on which the present trial was based. Therefore, *N.J.R.E.* 404(b) governs admissibility of each remark:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

██ Other-crimes evidence is considered highly prejudicial. *See State v. Stevens*, 115 *N.J.* 289, 309, 558 *A.*2d 833 (1989) ("[T]he inherently prejudicial nature of [other-crimes] evidence casts doubt on a jury's ability to follow even the most precise limiting instruction."). The risk involved with such evidence is "that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself." *State v. G.S.*, 145 *N.J.* 460, 468, 678 *A.*2d 1092 (1996) (citing *Stevens, supra,* 115 *N.J.* at 302, 558 *A.*2d 833); *see also State v. Gibbons*, 105 *N.J.* 67, 77, 519 *A.*2d 350 (1987) (discussing prejudicial danger of other-crimes evidence). To be sure, *N.J.R.E.* 404(b) recognizes some limited uses for other-crimes evidence, such as motive and plan. However, there is no such claim in this case. This is a pure case of inadmissible prejudicial evidence of prior bad acts seeping into a criminal trial.

██ The second category of challenged evidence is the testimony regarding the domestic violence restraining order that issued as a result of the incident in this case. In addition to suffering from similar infirmities to those inherent in other-crimes evidence, the domestic-violence-restraining-order testimony bore an additional stigma—it told the jury that a judge had found defendant guilty of domestic violence *in this matter*. That evidence not only fostered the suggestion that defendant was guilty of that which was charged, but told the jury that a judicial officer believed the victim, thus bolstering her credibility. *See Chenique–Puey, supra,* 145 *N.J.* at 343, 678 *A.*2d 694 (holding that trial court should sever charge on terroristic threats to kill from trial of contempt of domestic violence restraining order when they arose "from the same criminal episode"); *State v. Castagna*, 400 *N.J.Super.* 164, 183, 946 *A.*2d 602 (App.Div.2008) ("Under our law, the admission of domestic violence restraining orders as *Rule* 404(b) evidence is an issue of great sensitivity."); *State v. Silva*, 378 *N.J.Super.* 321, 325, 875 *A.*2d 1005 (App.Div.2005) ("There is no question that defendant would be unduly prejudiced ... because, like in *Chenique–Puey*, the jury here may improperly conclude that defendant may have [committed] assault[ ] ... based, in part, on a

previous judicial finding of domestic violence."); *State v. Lozada,* 357 *N.J.Super.* 468, 472–73, 815 *A.*2d 1002 (App.Div.2003) (concluding that trial court erroneously combined charges of stalking and violation of domestic restraining order because jury's knowledge that there has been restraining order prejudices defendant's right to fair trial).

In *Chenique–Puey, supra,* we held that evidence of a prior domestic violence restraining order was so prejudicial that the trial judge erred in not severing the restraining order violation from the terroristic threat charge:

> Admission of the order could have prejudiced unduly defendant by bolstering the victim's testimony regarding defendant's prior bad acts. A jury could interpret the order as a judicial imprimatur on the victim's testimony. The order creates the inference that if a court found defendant guilty of domestic violence in a prior proceeding, that defendant is more likely guilty of the present terroristic-threat charges.
>
> [145 *N.J.* at 343, 678 *A.*2d 694.]

In this case the final restraining order was issued as a result of defendant's actions in this very matter, thus rendering the prejudice even greater than in *Chenique–Puey.*

Standing alone, the domestic-violence-restraining-order evidence was highly damaging to defendant's case.[2] Together with the serial references to defendant's prior bad acts, that evidence had a real potential to prejudice defendant. We thus turn to the efforts of the trial judge to neutralize the negative effects of what transpired.

## IV.

■■ Generally, for an instruction to pass muster in such circumstances, it must be firm, clear, and accomplished without delay. *See Winter, supra,* 96 *N.J.* at 649, 477 *A.*2d 323 (holding

---

[2] We disagree with the Appellate Division that this issue was not raised on appeal except as an arrow in the ineffective-assistance-of-counsel quiver. A fair reading of defendant's appellate brief reveals that the issue was raised on its merits and we treat it accordingly.

instruction sufficient because "[b]efore defense counsel even objected, the court struck the offending remark" and, after brief recess, issued "sharp and complete curative instruction"); *State v. La Porte*, 62 *N.J.* 312, 318, 301 *A.2d* 146 (1973) ("The trial judge immediately instructed the jury in the strongest terms to disregard the offending remark."). This Court has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial. *See State v. Wakefield*, 190 *N.J.* 397, 440, 452, 921 *A.2d* 954 (2007) (noting trial court issued "immediate" curative instructions "promptly and effectively"), *cert. denied*, 552 *U.S.* ——, 128 *S.Ct.* 1074, 169 *L.Ed.2d* 817 (2008); *Verdicchio v. Ricca*, 179 *N.J.* 1, 36, 843 *A.2d* 1042 (2004) ("Each of those statements was improper and the trial court immediately identified each as such. The court went on to instruct the jury regarding the improper statements, declaring that they should not be considered during the deliberations on the case."); *State v. Papasavvas*, 163 *N.J.* 565, 614, 751 *A.2d* 40 (2000) (explaining that State expert's testimony regarding defendant's guilt was improper but "the trial court's curative instructions given immediately after [the] statements ... were sufficient to remedy [the] improper testimony" (citing *Winter, supra*, 96 *N.J.* 640, 477 *A.2d* 323)); *State v. Harvey*, 151 *N.J.* 117, 205, 699 *A.2d* 596 (1997) (concluding that trial court's curative instruction was sufficient because it was immediate and it specifically instructed jurors to disregard reference to unindicted suspect's polygraph results), *cert. denied*, 528 *U.S.* 1085, 120 *S.Ct.* 811, 145 *L.Ed.2d* 683 (2000); *State v. Hernandez*, 334 *N.J.Super.* 264, 273, 758 *A.2d* 1139 (App.Div.2000) ("While we agree that the conduct of the prosecutor complained of by defendant was improper and unjustifiable, we are also satisfied that any potential prejudice was avoided by the trial judge's prompt and firm curative instructions."), *aff'd*, 170 *N.J.* 106, 784 *A.2d* 1225 (2001); *State v. Catlow*, 206 *N.J.Super.* 186, 193, 502 *A.2d* 48 (App.Div. 1985) ("The record reveals no reason to believe that the jury was unable to follow the court's sharp and complete curative instruc-

tion." (citations omitted)), *certif. denied,* 103 *N.J.* 465, 511 *A.*2d 648 (1986).

In addition, a single curative instruction may not be sufficient to cure the prejudice resulting from cumulative errors at trial. *See State v. Frost,* 158 *N.J.* 76, 86–87, 727 *A.*2d 1 (1999) (holding that when remarks are "only slightly improper," general charge may be sufficient, but in face of cumulative prosecutorial improprieties, single curative instruction did not suffice (citing *State v. Setzer,* 268 *N.J.Super.* 553, 566, 634 *A.*2d 127 (App.Div. 1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994); *State v. Watson,* 224 *N.J.Super.* 354, 362, 540 *A.*2d 875 (App.Div.), *certif. denied,* 111 *N.J.* 620, 546 *A.*2d 537, *cert. denied,* 488 *U.S.* 983, 109 *S.Ct.* 535, 102 *L.Ed.*2d 566 (1988))).

Defendant argues that the trial judge's instruction violated the immediacy prong of our standard because it was not given when the offending statements were elicited. The State counters that because the trial was so brief, the end-of-case instruction sufficed. We need not resolve that timing issue because the substance of the instruction was inadequate.

As we have said, together the challenged statements reinforced each other and the poisonous notion that defendant was predisposed to the acts with which he was charged and, in fact, that a judge who had reviewed the case issued a restraining order against defendant. Recognizing that potential for prejudice, the trial judge ultimately gave an instruction at the end of the trial:

> During the course of the trial, also, things were blurted out that have nothing to do with this case. You can't use any of that blurted out information because that's not part of this case. Do you understand what I am saying? It's what you heard from the witness stand. Both parties have a right for you to consider only that which was dealt with in this courtroom relating to an incident that happened on May 21st, 2005[,] in North Brunswick. Nothing before this, nothing after this. We are on the same page.

That instruction did not fulfill its purpose. It did not identify what was "blurted out" or what information was "not part of this case." Indeed, it suggested that what the jurors "heard from the witness stand" could be considered and that anything that was

"dealt with in this courtroom" relating to the May 21, 2005, incident was fair game. The jurors could well have thought that because the prior incident involved the same parties, or because the domestic violence order arose out of this case, they related to the trial. Although in the last sentence of the instruction the judge was surely trying to eliminate consideration of the prior bad acts and the subsequent domestic violence order, the language was simply not clear enough or sharp enough to achieve its goal.

It is unfortunate that defense counsel did not object to the prejudicial statements as they occurred. That would have given the judge a clear opportunity to react, to instruct the jury properly, and, perhaps, to forestall the piling on that occurred. The judge's effort at the end of the trial was also met with silence. Had that not been the case, he might have been able to retool the charge appropriately. As it was, the instruction left the jury with a lack of certainty regarding what it could and could not consider.

This was a short trial, less than two full days from opening arguments to verdict; only three witnesses testified. Throughout the testimony, the three witnesses against defendant made him out to be a repetitive perpetrator of domestic violence. In addition, the jury was told that a judge had already issued a restraining order based on the facts alleged by Vera.

Because the jury instruction was inadequate, we have no alternative but to assume that the jurors took into account all of what transpired at trial, and we can have no confidence that defendant's convictions for kidnapping, robbery, terroristic threats, and assault that arose out of this failed romantic relationship were based only upon admissible evidence. Thus, a new trial is required.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to the trial court for proceedings consistent with the principles to which we have adverted.

Justice RIVERA–SOTO, dissenting.

In an incident that lasted over thirteen hours, defendant Diego Vallejo repeatedly assaulted his paramour while keeping her confined in a locked room. The victim ultimately was able to escape, the police were called, and defendant was tried and convicted for those events. Defendant's motion for a new trial was denied and, in an unpublished opinion, the Appellate Division affirmed defendant's convictions and sentence.

Rejecting the reasoning, analysis and findings advanced by the Appellate Division, the majority concludes that defendant's "brief trial was poisoned by the recurring admission of evidence of other crimes and wrongdoings by defendant, and by reference to the domestic violence restraining order against him." *Ante* at 124, 965 *A.*2d at 1182. The majority also concludes that "[t]he trial judge's curative instruction was too little, too late." *Ibid.* Based on those conclusions, the majority holds that "defendant was denied the fair trial to which all defendants, regardless of the strength of the case against them, are entitled[, and t]herefore, a new trial is required." *Ibid.* I respectfully dissent.

It is telling that defendant did not object to the testimony of alleged prior bad acts elicited from the prosecution's witnesses, testimony that centered in large measure on the fact that defendant had battered his paramour on earlier occasions.[1] It is also

---

[1] On direct testimony, these consisted of the victim's testimony that, when she telephoned her mother for help, her mother knew that something was amiss between defendant and the victim because they had had "incidents before;" the mother's subsequent tape-recorded 911 call, when, in response to the dispatcher's inquiry as to whether "anything like this happened before," the victim's mother replied "Oh ... many times[;]" the victim's statement, during direct examination, that "Okay, I got confused when you said May. I thought it was the incident in East Brunswick. All right, this is the one that happened in New Brunswick[;]" and, in response to the prosecutor's question whether, "as a result of this[,] did you get a restraining order against defendant[,]" the victim replied "yes, and it was finalized." Finally, on cross-examination, the responding police officer was asked whether the victim's mother was "encouraging [him] to arrest [defendant]" and he replied that the victim's mother "was claiming that [defendant] had beaten [the victim] up in the past and things of that nature."

telling, as the Appellate Division noted, that it was "the judge [who] acknowledged the need for a curative instruction concerning the testimony about the prior alleged incidents, and said that he would give a curative instruction the next day." Yet, as the panel also made clear, "[n]either side proposed any language for that instruction." The trial court then charged the jury that

> During the course of the trial, also, things were blurted out that have nothing to do with this case. You can't use any of that blurted out information because that's not part of this case. Do you understand what I am saying? It's what you heard from the witness stand. Both parties have a right for you to consider only that which was dealt with in this courtroom relating to an incident that happened on May 21st, 2005 in North Brunswick. Nothing before this, nothing after this.

As the Appellate Division tersely noted, defendant "did not object to this instruction" and defendant never requested a mistrial on those grounds.

No doubt, the statements made concerning defendant's prior assaults of the victim and the resulting restraining order entered against defendant likely should not have been admitted at this trial.[2] However, as the Appellate Division aptly noted, "[w]hen inadmissible evidence 'comes to the attention of the jury,' it is within the discretion of the trial court to either issue a curative instruction or grant a mistrial." (quoting *State v. Winter*, 96 *N.J.* 640, 646–47, 477 *A.*2d 323 (1984)). Assessing whether the curative instruction given was sufficient, the panel noted that

> "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." *Id.* at 647 [477 *A.*2d 323]. Even in the context of an error of constitutional magnitude, the Court has stated that "not 'any' possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *Ibid.* "Unless manifest injustice would result, the trial court's decision will be affirmed." *State v. Hogan*, 297 *N.J.Super.* 7 [687 *A.*2d 751] (App.Div.1997), *certif. denied*, 149 *N.J.* 142 [693 *A.*2d 111] (1997).

The panel concluded that, "[b]ecause defendant did not object to the curative instruction, any error is not cognizable on appeal

---

[2] Defendant also asserts that his counsel was ineffective in failing to object to the testimony concerning the prior domestic violence restraining order.

unless it was 'clearly capable of producing an unjust result.' " (quoting *State v. Bragg*, 295 *N.J.Super.* 459, 468, 685 *A.*2d 488 (App.Div.1996); *R.* 2:10–2).

The Appellate Division then reasoned that "[w]hen determining whether a curative instruction is adequate, the . . . focus[is] on when it was given and whether it was forceful or specific." It concluded that, on the whole, the jury charge given "specifically directs the jury to only consider evidence about the day in question" and that, in those circumstances, " '[w]e must assume that the jury understood and followed that instruction.' " (quoting *State v. Mays*, 321 *N.J.Super.* 619, 630, 729 *A.*2d 1074 (App.Div.), *certif. denied*, 162 *N.J.* 132, 741 *A.*2d 99 (1999)). The panel further concluded that, "[e]ven if the trial court's curative instruction was inadequate, it was not clearly capable of producing an unjust result in light of the overwhelming evidence in the record of defendant's guilt." (citing *R.* 2:10–2).

The Appellate Division's reasoning and conclusions express a reasoned and measured view: if there was error in the admission of some of the testimony in this case, the absence of any contemporaneous objections requires that the case be viewed through the prism of plain error. *See State v. Castagna*, 187 *N.J.* 293, 312, 901 *A.*2d 363 (2006) (explaining that evidentiary determinations are subject to "harmless error" standard, to be disregarded unless " 'of such a nature as to have been clearly capable of producing an unjust result.' " (quoting *R.* 2:10–2)). The same result obtains if the focus shifts from the admission of otherwise inadmissible evidence to the curative instruction thereafter given by the trial court:

> Because defendant did not object to the jury instructions at trial, we must apply the plain error standard. *R.* 2:10–2; *State v. Torres*, 183 *N.J.* 554, 564 [874 *A.*2d 1084] (2005). We will reverse on the basis of unchallenged error if we find error that was "clearly capable of producing an unjust result." *R.* 2:10–2. In the context of a jury charge, plain error requires demonstration of "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Jordan*, 147 *N.J.* 409, 422 [688 *A.*2d 97] (1997) (citations omitted). We consider

alleged error in light of "the totality of the entire charge, not in isolation." *State v. Chapland,* 187 *N.J.* 275, 289 [901 *A.*2d 351] (2006). We have recognized that error in a jury instruction that is "crucial to the jury's deliberations on the guilt of a criminal defendant" is a " 'poor candidate[ ] for rehabilitation' under the plain error theory." *Jordan, supra,* 147 *N.J.* at 422 [688 *A.*2d 97] (citation omitted). Nevertheless, any alleged error also must be evaluated in light "of the overall strength of the State's case." *Chapland, supra,* 187 *N.J.* at 289 [901 *A.*2d 351].

[*State v. Burns,* 192 *N.J.* 312, 341, 929 *A.*2d 1041 (2007).]

Thus, even if it was error to admit the statements concerning defendant's prior assaults of the victim; and even if it was error to admit the concededly fleeting testimony concerning the domestic violence restraining order entered against defendant; and even if the curative instruction given somehow is deemed insufficient, the bedrock principles that rightly define the scope of appellate review nevertheless require that defendant overcome the overwhelming proofs of guilt in this case. In that context, one must conclude, as the Appellate Division did, that the strong independent evidence presented by the State—the victim's "extremely detailed testimony about what happened that day[;]" the photographs of the victim's bruises; the police officer's testimony concerning the appearance of the bedroom where the victim was held against her will and assaulted, which corroborated the victim's account; the victim's "demeanor" when the police officer spoke with her; and the police officer's observation of defendant when he grabbed the victim and preventing her from leaving—commands the conclusion that the complained-of errors were not clearly capable of producing an unjust result.

In the final analysis, even if one "assume[s] that the jurors took into account all of what transpired at trial," *ante* at 137, 965 *A.*2d at 1190, the majority's conclusion that "we can have no confidence that defendant's convictions for kidnapping, robbery, terroristic threats, and assault that arose out of this failed romantic relationship were based only upon admissible evidence[and, t]hus, a new trial is required[,]" *ibid.,* does not accord proper due to the strength of the proofs presented to the jury. When, as here, testimony is admitted without a contemporaneous objection; when, as here, defendant fails to tender any form of a curative

instruction; and when, as here, defendant also fails to object to the curative instruction given, our polestar should be whether the end result of that trial was fair. Given the quantum and quality of the State's case, the conclusion is inescapable: defendant was fairly convicted of the crimes for which he stood charged. Those convictions should be affirmed.

For the foregoing reasons, I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER and Justice LONG, LaVECCHIA, WALLACE, and HOENS—5.

*For affirmance*—Justice RIVERA–SOTO—1.