**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1788-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCUS J. COVINGTON,

    Defendant-Appellant.

_____

> Submitted September 16, 2021 – Decided October 20, 2021
>
> Before Judges Gooden Brown and Gummer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-09-0163.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Andrew J. Bruck, Acting Attorney General, attorney for respondent (Lauren Bonfiglio, Deputy Attorney General, of counsel and on the briefs).
>
> Appellant filed a supplemental pro se brief.

PER CURIAM

Following a jury trial, defendant was convicted of first-degree distribution of a controlled dangerous substance, namely, cocaine, N.J.S.A. 2C:35-5(a)(1), 2C:35-5(b)(1), and 2C:35-5(c) (count one); second-degree conspiracy to distribute cocaine, N.J.S.A. 2C:5-2, 2C:35-5(a)(1), 2C:35-5(b)(1), and 2C:35-5(c) (count three); third-degree distribution of cocaine within 1000 feet of school property, N.J.S.A. 2C:35-7 and 2C:2-6 (count four); second-degree distribution of cocaine within 500 feet of public housing, N.J.S.A. 2C:35-7.1 and 2C:2-6 (count five); and third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (count six).[1] He was sentenced to an aggregate extended term of twenty-four years' imprisonment, with a ten-year period of parole ineligibility. The convictions stemmed from a four-month sting operation during which a confidential informant (CI), defendant's childhood friend, conducted ten controlled drug purchases from defendant, obtaining over seven ounces of cocaine in total.[2] New Jersey State Police Detective Douglas Muraglia

---

[1] Defendant was charged with a co-defendant, Wayne Meyers, in counts three, four, five, and six. Meyers was charged separately in count two with second-degree distribution of cocaine, N.J.S.A. 2C:35-5(a)(1), 2C:35-5(b)(2), 2C:35-5(c), and 2C:2-6.

[2] Distribution of cocaine "in a quantity of five ounces or more" is a crime of the first degree. N.J.S.A. 2C:35-5(b)(1).

A-1788-18

coordinated the operation.  Muraglia and the CI, Corey Thomas, were the State's chief witnesses at trial.

On appeal, in his counseled brief, defendant raises the following points for our consideration:

POINT I

DETECTIVE MURAGLIA'S REPEATED REFERENCES TO DEFENDANT'S MEETINGS WITH THOMAS AS "TRANSACTIONS" VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL AND REQUIRE REVERSAL OF THE CONVICTIONS. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PAR[A]S. 1, 9, AND 10.

POINT II

DEFENDANT WAS DENIED DUE PROCESS BY THE STANDARDLESS USE OF A LARGE NUMBER OF CONTROLLED BUYS TO ARRIVE AT FIRST-DEGREE CHARGES BASED ON THE AGGREGATE WEIGHT OF THE DRUGS FROM EACH BUY. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PAR[A]S. 1, 9, AND 10.

POINT III

UNDER THE CIRCUMSTANCES OF THIS CASE, A TWENTY-FOUR-YEAR PRISON SENTENCE WITH TEN YEARS OF PAROLE INELIGIBILITY IS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE, AND SHOULD BE REDUCED.

In his pro se brief, defendant argues:

3

POINT ONE

THE ADMISSION OF HEARSAY TESTIMONY BEFORE THE JURY FROM A WITNESS WHO WAS NOT THE ENGINEER OF THE MAP ADMITTED INTO EVIDENCE, WHICH HAD NOT BEEN PROPERLY AUTHENTICATED BY AN AVAILABLE ENGINEER OF THE MAP DEPRIVED THE DEFENDANT OF HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION AND HIS DUE PROCESS RIGHT TO A FAIR TRIAL THEREFORE, THE CONVICTION SHOULD BE REVERSED.

POINT TWO

THE ADMISSION OF MORE THAN TWENTY IN-COURT VOICE IDENTIFICATIONS BY DETECTIVE MURAGLIA OF THE DEFENDANT BEFORE THE JURY WITHOUT ANY GUIDING JURY INSTRUCTION ON HOW TO EVALUATE OR CONSIDER THE VOICE IDENTIFICATIONS DEPRIVED THE DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL THEREFORE THE CONVICTION SHOULD BE REVERSED.

POINT THREE

THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING DETECTIVE MURAGLIA TO AUTHENTICATE A VIDEO HE WAS NOT RESPONSIBLE FOR RECORDING, ALLOWING HIM TO NARRATE THE VIDEO FOR THE JURY, AND PERMITTING THE PROSECUTOR TO SHOW THE JURY AN ALTERED VERSION OF THE VIDEO THAT WAS NOT TIMELY TURNED OVER TO THE DEFENSE PRIOR TO TRIAL, WHICH ALL DEPRIVED THE DEFENDANT OF HIS DUE

4

PROCESS RIGHT TO A FAIR TRIAL THEREFORE THE CONVICTION SHOULD BE REVERSED.

POINT FOUR

THE STATE ENGAGED IN OUTRAGEOUS GOVERNMENTAL CONDUCT BY PERMITTING DETECTIVE MURAGLIA TO ENGAGE IN SENTENCING ENTRAPMENT, AND DIRECTING LAB TECHNICIAN TO CONDUCT A COMBINED WEIGHT OF ALL OF THE DRUGS TO GET THE DEFENDANT TO A FIRST-DEGREE CHARGE, WHICH UNDERMINED THE DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL PROCESS THEREFORE THE CONVICTION SHOULD BE REVERSED.

POINT FIVE

THE DEFENDANT WAS DEPRIVED OF HIS SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO CONFRONTATION BY DETECTIVE MURAGLIA TESTIFYING REPEATEDLY TO THE LAB REPORTS OF THE SEIZED DRUGS THEREFORE THE CONVICTION SHOULD BE REVERSED.

Having considered the arguments in light of the record and applicable legal principles, we reject each of the points raised and affirm.

I.

Following the adjudication of various pre-trial motions, an eight-day jury trial was conducted in May 2018, during which the State produced five witnesses. In addition to Muraglia and Thomas, two detectives who assisted

A-1788-18

Muraglia by conducting surveillance during some of the controlled drug purchases, and an employee of the engineering company that created the official drug-free school zone map introduced as evidence testified for the State. Defendant did not testify or produce any witnesses. The relevant facts based on the testimony of the witnesses and the admitted exhibits may be summarized as follows.

Following his arrest in 2015 on drug distribution charges, Thomas, who had five prior criminal convictions consisting primarily of drug-related offenses, agreed to cooperate with Detective Muraglia by purchasing cocaine from defendant in exchange for dismissal of the charges[3] and payment for his efforts.[4] As a result, between February and June 2016, Thomas conducted ten controlled purchases of cocaine from defendant under the supervision of Muraglia, a nine-year veteran of the New Jersey State Police who had "been involved in hundreds of narcotics investigations."

According to Muraglia, after he instructed Thomas to call defendant and arrange to purchase "fifteen grams" of cocaine, Thomas set up the first

---

[3] As a result of Thomas's cooperation, his charges were ultimately dismissed on Muraglia's recommendation.

[4] Thomas was paid about $2500 for the investigation.

controlled purchase[5] for February 10, 2016.  Immediately prior to the February 10 meeting, Muraglia met with Thomas at a pre-arranged location and "conducted a thorough search of his person and his vehicle" with negative results.  Muraglia then gave Thomas $600 to purchase the drugs and "equipped [Thomas] with an on-body recording device . . . to transmit the interaction between [them]" to Muraglia and the "other detectives . . . conducting surveillance of the[] drug buys."  Next, Muraglia "initiated surveillance" of the ultimate meet location "on Riverside Avenue . . . in Trenton."  There, Muraglia observed defendant "pull[] up" in a black Mazda SUV "directly next to" Thomas's vehicle.  Wayne Meyers was "seated in the front passenger seat of [defendant's] vehicle."  While the vehicles were beside each other, "they rolled down the window[s]."  Muraglia then observed "an object . . . flying" from defendant's vehicle into Thomas's vehicle and "another . . . object going from . . . Thomas'[s] vehicle into [defendant's] vehicle."  Defendant "[drove] off" immediately thereafter.  As defendant pulled away, Thomas recited defendant's license plate number for identification purposes as Muraglia had instructed.  A

---

[5]  Muraglia described a controlled purchase as "a purchase of drugs . . . facilitate[d]" by law enforcement.

subsequent "look[]-up" confirmed defendant was "the registered owner . . . of the vehicle."

A recording of the February 10 meeting between Thomas and defendant was captured on "the on-body recording device . . . affixed to . . . Thomas." The recording was played for the jury during the trial. Muraglia identified Thomas's voice on the recording from his prior familiarity with Thomas and defendant's voice from seeing "him seated . . . in the vehicle" in proximity to Thomas. Video surveillance footage of the February 10 meeting was also obtained "from a fixed pole camera" and was played for the jury during the trial. The video depicted the objects being "transferred from one vehicle to another" during the meeting.[6]

After the meeting, Muraglia met with Thomas at a prearranged location and conducted another "thorough search of his body and . . . vehicle" with negative results. Muraglia took custody of the "bag of cocaine" Thomas had purchased from defendant as well as "the on-body recorder" with which Thomas had been equipped. At Muraglia's request, Thomas also signed two photographs: one of defendant, whom Thomas identified as the individual from whom he had "just purchased the drugs," and the other of Wayne Meyers, whom

---

[6] Two versions of the same video were played for the jury, one version containing a "zoomed in" view of the "part where an object [was] transferred from [defendant's] vehicle to the informant's vehicle."

A-1788-18

Thomas identified as the individual seated inside defendant's vehicle during the narcotics transaction. Subsequent testing by the New Jersey State Police Laboratory confirmed that the substance purchased from defendant constituted "14.01 grams" of cocaine.

The other nine controlled drug purchases from defendant were conducted on March 10, 18, and 25, April 1, 6, 15, and 27, May 18, and June 15, 2016. All nine transactions were substantially similar to the first,[7] except that Thomas purchased twenty grams of cocaine from defendant for $800 during each of the March transactions, and twenty-five grams of cocaine for $1000 during each of the remaining transactions. Lab tests confirmed the purchases totaled over 200 grams of cocaine. All ten transactions occurred at various locations in Trenton,[8] at least one of which was within 1000 feet of a school and 500 feet of a public housing building.

---

[7] Meyers was present for only the March 18 and June 15 transactions. An uncharged individual, Rayshawn Bethea, was in defendant's vehicle during the March 10 transaction. Additionally, there was no surveillance video of the other nine transactions and during several of those transactions, Thomas actually entered defendant's vehicle to conduct the exchange.

[8] With the exception of the April 15 transaction for which defendant arrived on foot, defendant traveled to all ten meeting locations in his black Mazda SUV.

Thomas's account of the ten controlled drug purchases was completely consistent with Muraglia's. Thomas testified he had known defendant "[p]retty much" his whole life and selected defendant as a target for Muraglia's investigation. Thomas believed defendant would not question his desire to purchase cocaine from him for further distribution because Thomas had been selling drugs for over ten years.

Defendant's motion for judgment of acquittal at the close of the State's case, pursuant to Rule 3:18-1, was denied. Following the jury's guilty verdict and the denial of defendant's motion for a new trial, R. 3:20-1, defendant was sentenced on April 23, 2019. A memorializing judgment of conviction was entered on May 6, 2019, and this appeal followed.

II.

In Point I of his counseled brief, defendant argues Muraglia's "repeated" references over his objections "to Thomas's meetings with defendant as 'transactions'" constituted "impermissible opinion testimony on the ultimate issue in the case" because "whether defendant engaged in transactions with Thomas was the sole question the jury alone had to resolve." According to defendant, the impermissible testimony, which occurred "not fewer tha[n] twenty-five times," "unfairly bolstered Thomas's accounts of [his] meetings with

defendant," "unduly prejudiced the jury's finding of an essential element of the offenses," and denied him "a fair trial." Defendant further contends "[t]he single cautionary instruction" given by the trial court "sandwiched between mountains of improper testimony could not cure the prejudice."

Our Supreme Court has repeatedly held that proper use of expert opinions in narcotics prosecutions is limited to subjects that are beyond the understanding of the average juror and are generally inadmissible if the alleged drug transaction occurred in a straightforward manner that the average juror can readily understand. See State v. Simms, 224 N.J. 393, 403 (2016); State v. Sowell, 213 N.J. 89, 100 (2013); State v. McLean, 205 N.J. 439, 450 (2011). However, lay witness testimony may be admitted "in the form of opinions or inferences if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. In that regard, perception "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell, or hearing." McLean, 205 N.J. at 457 (citations omitted).

For police officers, lay opinions may "convey information about what the officer 'believed,' 'thought' or 'suspected.'" Id. at 460. "Traditional examples of permissible lay opinions include the speed at which a vehicle was traveling; the

distance of a vehicle from the intersection where an accident occurred; signs and behaviors indicative of an individual's intoxication"; "the meaning of street slang"; "whether a neighborhood is a 'high crime area'"; and "with an appropriate foundation, the value of personal property owned by the witness." Id. at 457-59 (citations omitted). On the other hand, lay opinion testimony is impermissible when it constitutes "an expression of a belief in defendant's guilt" and "an opinion on matters that were not beyond the understanding of the jury." Id. at 463. Stated differently, lay opinion testimony is impermissible if is "not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion." Id. at 459 (first and second alterations in original) (quoting Brindley Fireman's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Nantambu, 221 N.J. 390, 402 (2015) (alteration in original) (quoting State v. Harris, 209 N.J. 431, 439 (2012)). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero,

148 N.J. 469, 484 (1997)).  "Accordingly, such rulings 'are subject to limited appellate scrutiny,' as trial judges are vested 'with broad discretion in making evidence rulings.'"  State v. Singh, 245 N.J. 1, 13 (2021) (first quoting State v. Buda, 195 N.J. 278, 294 (2008); then quoting Harris, 209 N.J. at 439).

Trial courts are not left without redress when potentially prejudicial testimony seeps into a trial.  A particularly apt tool for such occasions is curative instructions, which "must be firm, clear, and accomplished without delay."  State v. Vallejo, 198 N.J. 122, 134 (2009).  "Delay may allow prejudicial evidence to become cemented into a storyline the jurors create in their minds during the course of the trial."  State v. Herbert, 457 N.J. Super. 490, 506 (App. Div. 2019). "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached."  State v. Winter, 96 N.J. 640, 647 (1984).  Thus, when there are numerous errors, "a single curative instruction may not be sufficient to cure the prejudice resulting from cumulative errors at trial."  Vallejo, 198 N.J. at 136. Moreover, "[e]vidence that bears directly on the ultimate issue before the jury may be less suitable to curative or limiting instructions than evidence that is indirect and that requires additional logical linkages."  Herbert, 457 N.J. Super. at 505.

Here, it is undisputed that Muraglia testified as a lay witness, not an expert witness. In <u>McLean</u>, the Court "reversed the defendant's possession-with-intent-to-distribute convictions because [the] testifying police officer, who observed the defendant hand only an item to an individual in exchange for money during a surveillance, expressed the opinion that a drug transaction had occurred." <u>Simms</u>, 224 N.J. at 404 (citing <u>McLean</u>, 205 N.J. at 443). In <u>Simms</u>, while the Court reversed the "defendant's various drug convictions" based on cumulative errors in "the admission of the expert testimony," <u>id.</u> at 396, the Court also found the admission of a police officer's hearsay statement improper, where he stated that he had "possibly observ[ed] a C.D.S. transaction" and that "there was a C.D.S. transaction taking place." <u>Id.</u> at 404.

Here, the facts are clearly distinguishable as Muraglia's references to "transactions" were made within a different contextual setting. Indeed, Muraglia was describing his observations of controlled drug purchases he had orchestrated. His mistaken use of the term "transaction" to describe the prearranged meetings between Thomas and defendant neither communicated a belief in defendant's guilt nor gave an opinion on matters as to which the jury was just as competent to form a conclusion.

Moreover, the judge issued the following curative instruction to the jury:

14

[L]adies and gentlemen of the jury, when you hear the word transaction, I'm going to strike that word. That's for you to decide . . . whether the activity amounts to a transaction. You're the fact finders, all right? So going forward, if that word is repeated, the same instruction would apply . . . .

Thereafter, when Muraglia again used the term "transaction," the judge sua sponte reminded the jury: "Same instruction. We just heard the word again . . . . It's the activity. Your decision-making controls as to the nature of the activity." Although Muraglia used the term "transaction" numerous times after the instructions were given, the instructions had a prophylactic effect by directing the jurors that the same instruction would apply if the word was repeated. Further, in the final jury charge, the judge instructed the jury "[a]ny testimony that [he] may have had occasion to strike [was] not evidence and shall not enter in [the jury's] final deliberations." Clearly, the jury was well aware that it was not to consider the word. See Herbert, 457 N.J. Super. at 503 ("The authority is abundant that courts presume juries follow instructions.").

In any event, the error was harmless given the overwhelming evidence of defendant's guilt. See State v. J.L.G., 234 N.J. 265, 306 (2018) (finding "errors harmless in light of the overwhelming evidence of defendant's guilt"). Both Muraglia and Thomas provided consistent accounts of all ten controlled drug purchases from defendant, which were corroborated by audio recordings of

15

conversations between Thomas and defendant, video surveillance footage of the first meeting, and the seizure of the prescribed quantity of cocaine sought to be procured. See Sowell, 213 N.J. at 107 (finding erroneously admitted expert testimony that a narcotics exchange occurred did not warrant reversal of defendant's conviction because of "overwhelming evidence," including an officer's observations of an item being transferred, immediate recovery of drugs from a bag where defendant was observed hiding the item, a video capturing the exchange, and defendant's admission).

In Point II of his counseled brief, defendant contends, "Muraglia directed [Thomas] to continue to conduct controlled buys over a four-month period so that the State could aggregate the weight of the drugs from each buy and charge a street-level dealer with first-degree weight." According to defendant, "this investigative technique," for which there are no "pre-existing standards," resulted in "sentencing entrapment" and a denial of "due process and fundamental fairness," warranting "a downgrade" to "a lower[] degree offense."

"New Jersey's doctrine of fundamental fairness 'serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental procedures that tend to operate arbitrarily.'" State v. Vega-Larregui, 246 N.J. 94, 132 (2021) (quoting Doe v. Poritz, 142 N.J. 1, 108

(1995)).  "This unique doctrine is not appropriately applied in every case but only in those instances where the interests involved are especially compelling." Doe, 142 N.J. at 108.  Indeed, "[i]t is appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation."  Ibid. (quoting State v. Yoskowitz, 116 N.J. 679, 712 (1989) (Garibaldi, J., concurring and dissenting)).  Where the doctrine has been applied, "there is one common denominator in all of those cases: a determination that someone was being subjected to potentially unfair treatment and there was no explicit statutory or constitutional protection to be invoked."  Id. at 109.

Those circumstances do not obtain here as statutory protections abound. First, N.J.S.A. 2C:35-5(c) explicitly allows for the aggregation of drug sales to determine the grade of offense.  See N.J.S.A. 2C:35-5(c) ("[T]he quantity involved in individual acts of manufacturing, distribution, dispensing or possessing with intent to distribute may be aggregated in determining the grade of the offense . . . provided that each individual act . . . was committed within the applicable statute of limitations."); see also State v. Rivastineo, 447 N.J. Super. 526, 531 (App. Div. 2016) ("There are no facial ambiguities in N.J.S.A. 2C:35-5(c) because the plain meaning is clear: a single substance, possessed on

different occasions with the intent to distribute, may be aggregated to reach the five-ounce, first-degree weight.").

Further, "[t]he New Jersey Code of Criminal Justice expressly provides entrapment as an affirmative defense." State v. Gibbons, 105 N.J. 67, 73 (1987) (citing N.J.S.A. 2C:2-12). Although "[t]he Court has interpreted N.J.S.A. 2C:2-12 as requiring that a defendant claiming entrapment prove both subjective and objective entrapment," the entrapment defense could also "be established by objective evidence of especially egregious police misconduct, even if predisposition was shown." Id. at 73-74. See State v. Talbot, 71 N.J. 160, 167-68 (1976) ("[A]s the part played by the State in the criminal activity increases, the importance of the factor of defendant's criminal intent decreases, until finally a point may be reached where the methods used by the State to obtain a conviction cannot be countenanced, even though a defendant's predisposition is shown.").

Additionally, if supported by "a compelling reason," State v. Megargel, 143 N.J. 484, 501 (1996), our sentencing scheme allows the trial court to sentence a first-degree offender one degree lower. See N.J.S.A. 2C:44-1(f)(2) (permitting the court to sentence a first-degree offender "to a term appropriate to a crime of one degree lower" in situations "where the court is clearly

18

convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands"). That defendant was unable to avail himself of these statutory protections does not justify the application of the doctrine of fundamental fairness in the absence of unjust and arbitrary governmental action.

Nonetheless, defendant argues he was subjected to sentencing entrapment or sentencing manipulation, relying on federal concepts developed in response to perceived abuses in the restrictive scheme of the federal sentencing guidelines. See United States v. Baber, 161 F.3d 531, 532 (8th Cir. 1998) (explaining that to justify a downward departure under the federal sentencing guidelines, a defendant bears the "burden to show that sentencing entrapment or sentencing manipulation occurred" by virtue of officers engaging in "later drug transactions solely to enhance [defendant's] potential sentence"); see also United States v. Calva, 979 F.2d 119, 123 (8th Cir. 1992) (recognizing police "must be given leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy"). Our courts have never recognized these federal concepts, and we reject defendant's invitation to do so here.

In Point III of his counseled brief, defendant argues his "twenty-four-year term of imprisonment for a street-level drug dealer is unreasonable and cannot be sustained."[9]  Defendant asserts "[w]hile the finding of [aggravating factors three, six, and nine, and mitigating factor eleven[10] is] supported by competent credible evidence in the record, the weighing of these factors . . . cannot justify the sentence imposed."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts.'"  State v. Cuff, 239 N.J. 321, 347 (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the]

---

[9]  Defendant does not dispute that he qualified for a mandatory extended term based on his prior drug convictions.  See N.J.S.A. 2C:43-6(f).  Defendant's sentence was reduced to the twenty-four-year term, with a ten-year parole disqualifier, after the judge reconsidered the original sentence and determined he had considered the wrong sentencing range in imposing that sentence.

[10]  See N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); N.J.S.A. 2C:44-1(a)(6) ("the extent of the defendant's prior criminal record and the seriousness" of the offenses); N.J.S.A. 2C:44-1(a)(9) (the need to deter "defendant and others from violating the law"); N.J.S.A. 2C:44-1(b)(11) (defendant's imprisonment "would entail excessive hardship to [himself] or [his] dependents").

> case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, we see no reason to interfere with the judge's proper exercise of his sentencing discretion.

We need not tarry long on defendant's pro se arguments. Defendant challenges, as a violation of his confrontation rights under Crawford v. Washington, 541 U.S. 36 (2004), the admission of the drug-free school zone map commissioned and adopted by the City of Trenton and utilized by the State to establish an essential element of count four. In State v. Wilson, our Supreme Court held that such maps are "nontestimonial" and their "admission therefore did not violate defendant's confrontation rights." 227 N.J. 534, 538 (2017). The Court further held "that such maps are admissible, if properly authenticated . . . as public records pursuant to N.J.R.E. 803(c)(8)" and "under N.J.S.A. 2C:35.7.1(e) or, by analogy, N.J.S.A. 2C:35-7(f). Wilson, 227 N.J. at 538.

Here, we discern no abuse of discretion in the judge's decision that the map was properly authenticated by Americo Lucchi, an employee of Lanning Engineering Company, the company that created the map for the City of Trenton. The judge found that while Lucchi was not "the designer" of the map,

he had "been with the company [for fifty-eight] years," was "familiar with the methodology that the company employ[ed] in [the] creation of such maps" and described the "margin of error within two or three percent." Further, Lucchi would be subject to cross-examination. Thus, the judge concluded Lucchi's testimony satisfied the requirements of N.J.R.E. 901, permitting authentication by "direct proof and circumstantial evidence."

"Proper authentication of the map required a witness who could testify to its authenticity and be cross-examined on the methodology of the map's creation and its margin of error." Wilson, 227 N.J. at 553. That was done here.

Defendant also argues the judge should have sua sponte given an identification charge to guide the jury in evaluating Muraglia's "in-court voice identifications" of defendant "as the person whose voice was being heard on [the] audio recordings." Muraglia testified he recognized defendant's voice on the audio recordings from observing the actual meetings. According to Muraglia, defendant and Thomas were the only participants in several of the meetings.

During the final charge, the judge gave a modified identification charge in connection with the in-court identification of defendant by the law enforcement witnesses and Thomas, as well as the out-of-court identification of

22

defendant by Thomas. Because there was no objection to the charge at trial, we review defendant's challenge for plain error and reverse only if the error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2). In State v. Williams, we held a jury instruction specifically on voice identification was unwarranted because "voice identification was not the key factor in the case" and "the State's other proofs were strong." 404 N.J. Super. 147, 166 (App. Div. 2008). We reach the same conclusion here.

Defendant further argues the judge abused his discretion in allowing Muraglia "to authenticate" the surveillance video and "to narrate the video before the jury." According to defendant, the error was compounded by permitting the prosecutor "to admit an altered version of the video slowed down and zoomed in . . . over the objection of trial counsel." We reject defendant's contentions as baseless. First, Muraglia had first-hand knowledge of what was depicted on the video from conducting contemporaneous surveillance of the meeting between defendant and Thomas. Further, Muraglia actually witnessed the commission of the crime. See State v. Lazo, 209 N.J. 9, 24 (2012) (acknowledging the propriety of lay opinion identification testimony where the detective "witnessed the crime" and knew the defendant).

"N.J.R.E. 701 requires only that testimony be rationally based on the witness's perception and that such testimony help the jury." Singh, 245 N.J. at 5. "Simply because the jury may have been able to evaluate" the video for itself did not render Muraglia's testimony "unhelpful" or mean that the detective's "testimony usurped the jury's role." Id. at 20.

Finally, defendant argues Muraglia should not have been permitted to testify about the lab results for the seized cocaine for each of the ten drug sales instead of the actual author of the lab reports. N.J.S.A. 2C:35-19 allows the admission of a certificate of analysis in a criminal prosecution as "evidence of the composition, quality, and quantity of the substance submitted to the laboratory for analysis" unless an objection is filed by the opposing party "within [ten] days" of "receiving the adversary's notice of intent to proffer the certificate." N.J.S.A. 2C:35-19(b) and (c). The sworn certificate

> shall contain a statement establishing . . . the type of analysis performed; the result achieved; any conclusions reached based upon that result; that the subscriber is the person who performed the analysis and made the conclusions; the subscriber's training or experience to perform the analysis; and the nature and condition of the equipment used.
>
> [N.J.S.A. 2C:35-19(b).]

24

"A failure to comply with the time limitations regarding the notice of objection . . . shall constitute a waiver of any objections to the admission of the certificate." N.J.S.A. 2C:35-19(c).

Following a hearing, the judge admitted the certificate "without the testimony of the lab analyst who authored the certified lab reports," finding "the proffered laboratory certificates comport[ed] with [the] statutory criteria for admissibility under [N.J.S.A. 2C:35-19(b)]" and "defendant did not timely object to the admissibility of the . . . certificates as required by [N.J.S.A. 2C:35-19(c)]." We affirm the judge's decision substantially for the detailed findings and cogent reasons expressed by the judge.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1788-18