**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1887-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHINAZA D. OKEKE,

     Defendant-Appellant.

_____

Argued September 29, 2021 – Decided March 18, 2022

Before Judges Fuentes, Gilson, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-11-3255.

Michele E. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Michele E. Friedman, of counsel and on the briefs).

Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor; attorney; Matthew E. Hanley, of counsel and on the briefs).

PER CURIAM

In connection with an incident involving his former girlfriend, a jury convicted defendant Chinaza Okeke of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(12), and acquitted him of third-degree terroristic threats, N.J.S.A. 2C:12-3(a). He was sentenced to two years of probation.

Defendant appeals, arguing that during the trial repeated references were made to a temporary restraining order (TRO) that the victim had obtained against him. All three witnesses who testified at trial were asked about and discussed the TRO. Defense counsel and the prosecutor also referenced the TRO in their closing arguments. Even though defendant did not object to the testimony or arguments about the TRO, the trial court should have given curative instructions. Because the trial court failed to give those instructions, we are constrained to hold that the repeated inadmissible references to the TRO constituted plain error and deprived defendant of a fair trial. We vacate his conviction and remand this matter.

A-1887-19

I.

Defendant was convicted following a jury trial involving two days of testimony and evidence.[1] Three witnesses testified: the former girlfriend, E.E. (Erica),[2] a police officer, and defendant.

Erica testified that she had dated defendant for about six months before the incident. She explained that she would occasionally stay at defendant's apartment, and she kept certain personal items there, including clothing and her computer. According to Erica, on the evening of May 10, 2017, she told defendant she was breaking up with him and that she would be leaving the next morning. She then packed her belongings, placed them by the door, and slept on the couch.

The next morning, defendant woke Erica, wanting to talk about their conversation the previous night. When Erica responded that they could talk when she completely woke up, defendant poured a bottle of water on her and threw the bottle at her. Erica then got up, and defendant began going through

---

[1] While there were several other days of trial, the testimony and evidence were presented on only two days and the other days involved jury selection and delivery of the jury verdict.

[2] We use initials and a fictitious name for the victim to protect her privacy interests. See R. 1:38-3(c)(12).

A-1887-19

her belongings. When she pulled defendant's hand away from her clothes, defendant started punching her. Erica retreated, but defendant continued to punch her as she laid "cuddled" up on the floor. Erica explained that defendant then walked away, grabbed her cell phone, and went into the kitchen. She took that opportunity to run out of the apartment, she encountered the building's superintendent, and the police were called. When the police arrived, they retrieved her cell phone and took Erica to the police station so that she could make a statement. Thereafter, Erica was taken to the hospital where she was treated for a fractured nose.

On her direct examination, the prosecutor asked Erica about obtaining a TRO. The prosecutor and Erica had the following exchange:

> [Prosecutor:] And when you went to the police precinct, did the police offer you—say if you would wish to get a temporary restraining order?
>
> [Erica:] Yes, but I was in pain at the point, so I asked them if I could do it when I come back from the hospital. They agreed.
>
> [Prosecutor:] And so did you get a temporary restraining order immediately at the police precinct that day?
>
> [Erica:] No. When I got back from the hospital, so I came the next day to do it.

A-1887-19

Defense counsel did not object.  Instead, on cross-examination, defense counsel questioned Erica about the TRO:

> [Defense counsel:]  Now you—you said you did not get a restraining order when you were at the police station?
>
> [Erica:]  No.
>
> [Defense counsel:]  You said you were in too much pain?
>
> [Erica:]  Yes.
>
> [Defense counsel:]  But you eventually did get a restraining order?
>
> [Erica:]  Yes.
>
> [Defense counsel:]  And didn't you drop the restraining order?
>
> [Erica:]  No.
>
> [Defense counsel:]  It's still in effect?
>
> [Erica:]  Yes.
>
> [Defense counsel:]  You didn't drop it and have it dismissed?
>
> [Erica:]  No.
>
> [Defense counsel:]  And basically tell the judge that you weren't afraid of him?
>
> [Erica:]  No.  I never told the judge I wasn't afraid of him.

A-1887-19

. . . .

> [Defense counsel:] Now[,] did you have a restraining order out of [] County?
>
> [Erica:] Yes.
>
> [Defense counsel:] And I'm going to show you what's been marked D-1. Are you able to identify that document?
>
> [Erica:] Yes.
>
> [Defense counsel:] And what is that document?
>
> [Erica:] It says that it was dismissed.
>
> [Defense counsel:] The restraining order.
>
> [Erica:] Yes.

At that point, the State objected, and the trial court sustained the objection. The record is not clear whether the order dismissing the restraining order was entered into evidence. Defense counsel, however, continued to question Erica about the TRO:

> [Defense counsel:] And you do remember the police asking you if you wanted a temporary restraining order, correct?
>
> [Erica:] Yes.
>
> [Defense counsel:] And wasn't your response to them that you'll just stay away from him, that you don't need a restraining order? Isn't that what you told the police?

6

[Erica:]  No.  I said I would come back in to make one.

[Defense counsel:]  So it's your testimony that you did not say that you would just stay away from him, that you didn't need a restraining order, correct?

[Erica:]  No.  I said I would come back in to make one.

Defense counsel then shifted his focus and began to ask Erica about a computer.  The following exchange was heard by the jury:

[Defense counsel:]  Now[,] as far as the computer, isn't it true that [defendant] bought that computer for you?

[Erica:]  Yes.

[Prosecutor:]  Objection, your Honor.  There has been no reference to any computer before and I don't see how it's relevant to the facts at issue in this case.

[The Court:]  Well, I'll overrule the objection, but this case is not about what [defendant] bought for [Erica], it's about allegations of evil[], not about buying things. You asked a lot of questions about that.  Please stay away from it.

On redirect, the prosecutor asked additional questions concerning the TRO:

[Prosecutor:]  As far as the TRO.  You applied for a TRO.  Is that right?

[The Court:]  Do you know what a TRO—a TRO is?

[Erica:]  No.

7

[The Court:]  Do you know what that is?

[Prosecutor:]  It's a temporary restraining order.

[Erica:]  Yeah.

. . . .

[The Court:]  The jurors may not know either.

[Prosecutor:]  Did you apply for a temporary restraining order?

[Erica:]  Not on the day of.

[Prosecutor:]  But you [did].

[Erica:]  Yes.

[Prosecutor:]  And was that restraining order granted?

[Erica:]  I really can't remember, but, yes, I think it was, yeah.

The State then called Police Officer Joseph Lane, who was one of the officers who responded to defendant's apartment building and met with Erica. During his direct testimony, the State questioned the officer about the TRO:

[Prosecutor:]  And what was the alleged victim's decision regarding a TRO?

[Officer:]  She said that she didn't want one at this time.

[The Court:]  What's a TRO?

[Officer:]  TRO, a temporary restraining order, sir.

8  A-1887-19

[Prosecutor:]  And are you aware she obtained a TRO after the—

[Defense counsel:]  Objection.

[The Court:]  Overruled.  If you know whether she obtained—of your own knowledge whether she obtained a temporary restraining order afterwards, you can tell us.  If you don't know, tell us you don't know.

[Officer:]  I don't know.

On cross-examination, defense counsel asked the officer if Erica had told him that she did not need a TRO and that she would stay away from defendant. The officer responded that Erica had said she did not want a TRO at the time that she was at the station, and he did not recall Erica stating that she did not need one.

When defendant testified, he offered a different version of events. According to defendant, he was home with Erica on the night before the police were called.  He told her that he no longer wanted to be with her, and she began to pack her things.  While packing, Erica took defendant's money and tried to put it in her bag.  Defendant attempted to grab the money back and Erica began hitting and kicking him.  Eventually, defendant pushed Erica out of the bedroom, closed the door, and went to bed.

A-1887-19

The next morning, defendant woke up and was surprised to find Erica sleeping on his couch. He asked her to talk about the events of the night before. They then began to argue, and he asked Erica to leave. When defendant attempted to retrieve his laptop and money, Erica kicked him and started to punch him. Defendant pushed Erica away, she threw mouthwash at him, and he tried to hold her back. Defendant went on to explain that he felt "like I needed to defend myself because if you—if you bring her right now, there's a mark here, she tried to stab me one day and it got hooked up[.]" At that point in his testimony, the State objected, and the court sustained that objection. Defendant then went on to testify that he had tried to calm Erica down, but she ran out of the apartment. Thereafter, the police arrived, and he was arrested and jailed.

On cross-examination, the State questioned defendant about the TRO:

> [Prosecutor:] And you're aware that a temporary restraining order was filed against you, correct?
>
> [Defendant:] Yes. No—not until—
>
> [Prosecutor:] One was filed against you, correct?
>
> [Defendant:] I don't know. She, like, I think two or four weeks later when I came to court, that's when she gave me the—
>
> [Prosecutor:] You were served with the temporary restraining order, correct?

[Defendant:]  Yes.  But not right—no, like a week or two, it was later.

The prosecutor then marked the temporary restraining order as an exhibit.

He showed defendant the TRO and the following exchange took place:

[Prosecutor:]  So a temporary restraining order had been filed and then you were later served with a continuance order.  Is that correct?

[Defendant:]  That's what I'm seeing here.

[Prosecutor:]  And this was served to you in court, correct?  By a sheriff officer?

[Defendant:]  Yeah.

[Prosecutor:]  And you're aware the restraining order expired, correct?

[Defendant:]  Yes.  I mean, she didn't show up in court, they dismissed it.  They [gave] me the paper for dismissal.

[Prosecutor:]  But you're also aware that there's a separate judicial order requiring that you have no contact with [Erica].  Is that correct?

[Defendant:]  Yes.

The TRO was also discussed in closing arguments both by defense counsel and the prosecutor.  During his closing arguments, defense counsel made the following remarks about the TRO:

11

Now the other thing going to credibility, if she was really, really afraid of him, why would she not get a restraining order the second that she could. I mean, basically, she could have told the cops, yeah, I want a restraining order. It was that simple. But she's like, no, no, I'm—you know, I don't want one. And then they have this thing called a Domestic Violence Response Team. She refused to meet with them. So at this point, it doesn't look like that she's a victim, she looks like somebody who is, you know, basically, you know, had a fight with him, realized it was a fight and wanted to just move on.

And that's probably why she didn't show up for the final restraining order hearing because she—she wanted to be done with this. And frankly, [defendant] is fine with that. He wants to be done with her.

In his closing, the prosecutor made the following comments concerning the TRO:

Now there was all this stuff about the temporary restraining order. And that's—it's a side show. This case is about the terroristic threat and assault. But we know that she did obtain that temporary restraining order. She didn't obtain it immediately because she was injured. She was going to the hospital. She got it after the event and that's consistent with what the officer testified. He said her statement was ["]I don't want to get a temporary restraining order at this time.["] It was just obtained. The officer described the injuries that he saw, we saw the photos, it all lines up.

At no time during the trial did the court give the jury any instructions regarding the testimony and arguments concerning the TRO. After hearing the

evidence, the jury acquitted defendant of the charge of terroristic threats and convicted him of third-degree aggravated assault. Defendant now appeals from his judgment of conviction.

II.

On appeal, defendant makes three arguments, which he articulates as follows:

> POINT I - THE COURT'S FAILURE TO PROVIDE INSTRUCTIONS REGARDING THE ISSUANCE OF THE TEMPORARY RESTRAINING ORDER AND THE JUDGE'S OWN STATEMENT THAT THE CASE INVOLVED ALLEGATIONS OF "EVILRY" NECESSITATE REVERSAL OF THE SINGLE CONVICTION IN THIS CASE. (NOT RAISED BELOW)
>
>> A. The Court's Failure to Issue a Limiting Instruction Regarding the Temporary Restraining Order Warrants Reversal of the Conviction.
>>
>> B. The Jury's Exposure to the Trial Judge's Statement that the Case Was About "Allegations of Evil[]," In Conjunction With the Court's Failure to Cure the Prejudice Exuding from this Error, Warrants Reversal.
>>
>> C. The Cumulative Effect of the Instructional Errors Necessitates Reversal of [Defendant's] Conviction.
>
> POINT II - THE COURT COMMITTED REVERSIBLE ERROR IN EXCLUDING THE

13

DEFENDANT'S TESTIMONY REGARDING THE VICTIM'S PRIOR VIOLENCE, WHICH WOULD HAVE SUPPORTED THE DEFENDANT'S CLAIM THAT HE ACTED IN SELF-DEFENSE.

POINT III - IN THE ALTERNATIVE, THE JUDGMENT OF CONVICTION MUST BE AMENDED, SO AS TO REFLECT THE THIRD-DEGREE OFFENSE.

We hold it was plain error to allow testimony and arguments about the TRO and that error denied defendant a fair trial. We, therefore, vacate defendant's conviction and remand for further proceedings.

1. The Testimony and Arguments About the TRO.

Evidence that a restraining order has been issued against a defendant is generally inadmissible in a criminal trial. State v. Chenique-Puey, 145 N.J. 334, 343 (1996) (finding restraining order inadmissible in criminal trial except "for the limited purpose of impeaching the defendant's testimony" if defendant testifies). Evidence of a restraining order "suffer[s] from similar infirmities to those inherent in other-crimes evidence," State v. Vallejo, 198 N.J. 122, 133 (2009), and "creates the inference that if a court found defendant guilty of domestic violence in a prior proceeding, that defendant is more likely guilty of the present [offense]." Chenique-Puey, 145 N.J. at 343; see also N.J.R.E. 404(b) (prohibiting evidence of other crimes or wrongs except for limited purposes);

14

State v. G.S., 145 N.J. 460, 468 (1996) (cautioning that other-crimes evidence risks "distract[ing] a jury from an independent consideration of the evidence that bears directly on guilt itself").  Further, admitting a restraining order can bolster a victim's testimony and unduly prejudice a defendant's right to a fair trial.  See Chenique-Puey, 145 N.J. at 343 (noting that a "jury could interpret the order as a judicial imprimatur on the victim's testimony").

Evidence of a restraining order issued in connection with the pending offense is even more harmful.  Vallejo, 198 N.J. at 133-34.  In that situation, evidence of a restraining order impermissibly tells the jury that a judge had "found defendant guilty of domestic violence in this matter."  Id. at 133. Accordingly, that evidence "not only foster[s] the suggestion that defendant [is] guilty of that which was charged, but [tells] the jury that a judicial officer believed the victim, thus bolstering [his or] her credibility."  Ibid.

When inadmissible evidence of a restraining order is presented to a jury, the trial court must give a curative instruction "to alleviate potential prejudice to a defendant," or defendant is entitled to reversal of his or her conviction.  Id. at 135.  The instruction, moreover, must generally "be firm, clear, and accomplished without delay."  Id. at 134; see also State v. Prall, 231 N.J. 567,

586 (2018) (explaining that "a curative instruction may sometimes be a sufficient remedy").

At defendant's trial, every witness who testified was questioned about the TRO. Credibility was a critical issue because Erica and defendant presented divergent descriptions of the incident. Consequently, testimony about the TRO was highly prejudicial because the jurors could have reasonably assumed that a judicial officer had reviewed the conduct at issue before them and concluded that Erica was credible. Vallejo, 198 N.J. at 133.

Just as critically, the trial court gave no curative instruction. The court gave no immediate instruction about the TRO when the references were made and no instruction about the TRO in the final charge.[3] To the contrary, the comments by the trial court suggested that the jury should consider the TRO. Twice, the trial court clarified that a "TRO" was a temporary restraining order. The court's comments made it clear that it wanted the jury to understand what a TRO was.

The State accurately points out defendant did not object to the references to the TRO and did not request a curative instruction. Therefore, we review the

---

[3] Because there are currently no model charges regarding refences to domestic violence restraining orders, we respectfully refer our opinion to the Model Criminal Jury Charges Committee for its consideration.

16

improper references to the TRO for plain error. See R. 2:10-2. Under the plain error standard, we reverse if the error is "clearly capable of producing an unjust result." State v. Rose, 206 N.J. 141, 157 (2011) (quoting R. 2:10-2).

All three witnesses testified within two days. The trial was a short trial, like the trial in Vallejo. 198 N.J. at 124. Also, like Vallejo, the trial "was poisoned . . . by reference[s] to the domestic violence restraining order against [defendant]." Ibid. Unlike Vallejo, there was no curative instruction in defendant's trial. Consequently, the error here was even clearer than the plain error in Vallejo.

The error here was also not an invited error. When reviewing for plain error, "trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). A "defendant cannot beseech and request a trial court to take a certain course of action, and upon adoption by the court, take his [or her] chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he [or she] sought and urged, claiming it to be error and prejudicial." State v. Jenkins, 178 N.J. 347, 358 (2004) (quoting State v. Pontery, 19 N.J. 457, 471 (1955)).

At defendant's trial, the inadmissible testimony concerning the TRO was first introduced by the State on the direct examination of Erica. Thereafter, defense counsel did question Erica about the TRO and even tried to use the delay in obtaining the TRO to undercut her credibility. Nevertheless, the defense tactic did not rise to the level of invited error or opening the door because the State already had introduced testimony concerning the inadmissible TRO. See State v. Vandeweaghe, 177 N.J. 229, 238 (2003) (explaining that the opening-the-door doctrine has limits and cannot be used to inject prejudice into a trial).

In summary, just as the Supreme Court did in Vallejo, we are constrained to reverse defendant's conviction and remand for further proceedings. Given that holding, we do not need to reach defendant's other arguments. Nevertheless, because we are remanding the matter, we add some limited guidance concerning those arguments.

2. Defendant's Other Arguments.

At defendant's trial, the State moved to amend the charge of aggravated assault from a second-degree to a third-degree charge. Indeed, the State concedes that the judgment of conviction incorrectly stated that defendant was convicted of a second-degree charge. On remand, defendant can face only a third-degree charge of aggravated assault.

18

Although we need not fully address defendant's arguments about the trial court's comment concerning "allegations of evil[]," we are confident that the trial court would avoid such a comment if there was a retrial. The comment about "evil[]" was made during a ruling on an objection and appears to have been inadvertent. We are confident that the trial court understands its important role and the need to constantly remain impartial. See State v. O'Brien, 200 N.J. 520, 523 (2009) (explaining that a trial judge "holds a powerful symbolic position vis-à-vis jurors . . . and must refrain from any action that would suggest that he [or she] favors one side over the other").

Finally, the issue of whether defendant could introduce testimony concerning Erica's prior conduct towards him should be addressed in pretrial proceedings to determine whether her alleged actions are relevant to defendant's claim of self-defense. See State v. Jenewicz, 193 N.J. 440, 459 (2008); N.J.R.E. 405; N.J.R.E. 404; N.J.R.E. 403. We express no view on that issue.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1887-19